# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| A.K.B., By and Through Her Mother and Guardian Marquette Silva; Marquette Silva; and Kenyatta Bowen; | Case No. 19-cv-2421 (SRN/KMM) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| Independent School District 194 and Debra Murphy, | |
| Defendants. | |

Richard E. Student, and Steven J. Meshbesher, Meshbesher & Associates, P.A., 10 S 5th St Ste 225, Minneapolis, MN 55402, for Plaintiffs.

Mark A Fredrickson, Joao C.J.G. De Medeiros, and Susan E Stokes, Lind Jensen Sullivan & Peterson, P.A., 901 Marquette Ave. S., Ste. 1300, Minneapolis, MN 55402, for Defendant Independent School District 194.

Allison N. Krueger, and Sally J. Ferguson, Arthur, Chapman, Kettering, Smetak & Pikala, PA, 81 S 9th St Ste 500, Minneapolis, MN 55402, for Defendant Debra Murphy.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter comes before the Court on Defendants Independent School District 194 ("the District") and Debra Murphy's Motion to Dismiss the Complaint ("Motion to Dismiss") [Doc. No. 10] for lack of subject matter jurisdiction and for failure to state a claim.  Plaintiffs commenced this action against the District and Ms. Murphy alleging violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132,

the Rehabilitation Act, 29 U.S.C § 794 (known as "§ 504" of the Rehab Act), the Minnesota Human Rights Act ( "MHRA"), Minn. Stat. § 363A.12-.13, and Minnesota common law for medical malpractice.

After carefully considering the parties' arguments at oral argument, the Court ruled from the bench on November 25, 2019. (Nov. 25, 2019 Hr'g Tr. [Doc. No. 25].) Specifically, the Court denied Defendants' motion, except with respect to the claims alleging violations of the ADA and the Rehab Act against Ms. Murphy. (*Id*.) Both claims were dismissed against Ms. Murphy in her individual and official capacity. (*Id*.) The Court then stated it would follow its ruling with a written order. (*Id*.) For the reasons stated on the record and more fully set forth below, Defendants' Motion to Dismiss is granted in part and denied in part.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a tragic asthma attack suffered by an eighth-grade student, A.K.B., at a school located within the District. (Compl. [Doc. No. 1] ¶¶ 1, 7, 12.) A.K.B.'s mother, Marquette Silva, appears to serve as A.K.B.'s primary legal guardian and brings this action on behalf of A.K.B. for damages she directly sustained.[1] (*Id*. ¶¶ 4-5.) At all relevant times, A.K.B. and her parents, Plaintiffs Marquette Silva and Kenyatta Brown, resided in Minnesota. (*Id*. ¶¶ 3, 5-6.) Moreover, during the relevant time period, Ms.

---

[1]     A.K.B.'s parents, Marquette Silva and Kenyatta Brown, also bring this action on their own behalf for damages they directly sustained. (Compl. ¶¶ 5-6.)

Murphy was a school nurse for the District.[2]  (*Id*. ¶ 9.)

A.K.B. was recognized as, and known to be a student with disabilities because of her history of severe asthma and related breathing problems.  (*Id*. ¶¶ 1, 13-14, 47; Decl. of Joao C.J.G. Medeiros ("Medeiros Decl.") [Doc. No. 13], Ex. 4 (*A.K.B. v. Lakeville Public Sch. Dist*., Minn. Dep't of Educ., MDE 19-013-H (July 30, 2019)) at 2-3.)  Defendants specifically "knew that A.K.B. required reasonable accommodations for her disability, including close respiratory monitoring and medical excuses from class during asthma exacerbations."  (Compl. ¶ 36.)  On several occasions, Plaintiffs communicated to the District the need for such accommodations and details about A.K.B.'s asthma.  (*Id*. ¶ 16.)  A.K.B. had frequently presented to Defendants at the school nurse's office for treatment of asthma exacerbations.  (*Id*. ¶ 17.)

In an administrative proceeding about this dispute, the District previously contended that it had a "plan for responding to A.K.B.'s asthma exacerbation."[3]  (Medeiros Decl., Ex. 4 at 2-3.)  Plaintiffs allege, on the other hand, that Defendants "failed to formulate a [] plan to address A.K.B.'s disability and need for accommodations[.]"  (Compl. ¶ 18.)  It appears, nonetheless, that at least as of April 16, 2019, A.K.B.'s treating pulmonologist provided an "updated Asthma Control Plan" to Defendants.  (*Id*. ¶ 16.)

---

[2]     While the Complaint does not specify Ms. Murphy as the school nurse and only alleges she was an "employee and agent" of the District, the Complaint alleges that Ms. Murphy worked at the school nurse's office.  (Compl. ¶¶ 17, 19.)

[3]     As explained below, Plaintiffs filed a due process complaint regarding this matter in an administrative proceeding through the Minnesota Department of Education.  It is clear, however, that the Court has the authority to consider this matter when subject matter jurisdiction is challenged under Rule 12(b)(1).  *Harris v. P.A.M. Transport, Inc*., 339 F.3d 635, 637 n. 4 (8th Cir. 2003).

The pulmonologist indicated, in writing, specific instructions for A.K.B.'s treatment during asthma exacerbations:

> During asthma exacerbations, [A.K.B.] requires frequent neb treatments and close respiratory monitoring until back to her baseline.

(*Id.*) (citing medical note from pulmonologist dated November 1, 2018). The pulmonologist's orders for A.K.B. were in Ms. Murphy's "Health Office Visit Report." (*Id.* ¶ 17.) It is alleged, however, that Ms. Murphy failed to engage in any respiratory monitoring on any of the occasions A.K.B. went to the school nurse's office for asthma exacerbations. (*Id.* ¶ 17; *see also* Medeiros Decl., Ex. 3 (Health Office Visit Report) at 1-4.) Indeed, between November 1, 2018 and April 16, 2019, A.K.B presented to Ms. Murphy for asthma-related care at least sixteen times. (*Id.*)

On April 16, 2019, A.K.B. went to the school nurse's office. (*Id.* ¶ 19.) She needed treatment for an asthma exacerbation. (*Id.*) A.K.B. was administered "albuterol nebulizer inhalation therapy," but her "resting pulse rate remained dangerously elevated at 124 beats per minute." (*Id.*) Despite an elevated heart rate, Ms. Murphy allegedly instructed A.K.B. to report to physical education class. (*Id.*) Before sending A.K.B. away, Ms. Murphy neither administered a peak flow meter test nor conducted other tests to check A.K.B.'s respiratory condition. (*Id.*)

A.K.B.'s asthma exacerbation worsened during her physical education class. (*Id.* ¶ 20.) Her airways eventually narrowed to the point that she could not breathe, and she lost consciousness. (*Id.*) A.K.B then suffered "oxygen deprivation and cerebral hypoxia/anoxia" for nearly thirty minutes while she waited for first responders to intubate

her.[4]  (*Id.* ¶¶ 21-22.)

Because of her prolonged oxygen deprivation, A.K.B. suffers from extensive, permanent brain damage.  (*Id.*)  She tragically remains in a persistent vegetative state.  (*Id.*)  Although discharged to home care, A.K.B. has required emergency medical intervention "on one or more occasions because of complications relating to her brain injury."  (*Id.* ¶ 22.)  This required medical intervention also lead to secondary abdominal and gastrointestinal injuries and symptoms.  (*Id.* ¶ 23.)  Because of these injuries, A.K.B. has "required and will continue to require daily and around-the-clock medical treatment for her condition, as well as professional caretaking for assistance with all of her activities of daily living, including but not limited to bathing, grooming, moving, transferring and eating."  (*Id.* ¶ 24.)  Plaintiffs further allege that, because A.K.B. will remain in a persistent vegetative state for the rest of her life, she will sustain a "complete loss of her lifetime earning capacity," and "incur significant medical expenses" for treatments for her brain and other injuries.  (*See id.* ¶¶ 23-28.)

A.     **Administrative Proceeding**

Prior to this lawsuit, Plaintiffs filed a due process hearing request and special education complaint against the District through the Minnesota Department of Education.  (*See* Medeiros Decl., Ex. 4 at 2.)  Plaintiffs specifically requested a due process hearing over concerns about the "dangers of issue and claim preclusion in other statutory or

---

[4]     A.K.B. was initially transferred to Fairview Ridges Hospital, but was later transferred to Children's Hospital in Minneapolis.  (Compl. ¶¶ 21-22.)

common law causes of action."[5]  (*Id*. at 3, 5) ("The Parents candidly state that they filed this due process complaint to exhaust their administrative remedies in anticipation of filing other civil claims against the School District.").

Plaintiffs requested that the administrative law judge ("ALJ") address "[1] whether A.K.B. was a student with a disability under the [Individuals with Disabilities Education Act] ("IDEA") prior to April 16, 2019; and [2] whether the District violated the IDEA by not having an Individual Education Plan ("IEP") in place for A.K.B."  (*Id*. at 3.)  If the ALJ concluded the District violated the IDEA, Plaintiffs requested a determination of the appropriate relief under the IDEA.  Plaintiffs asserted that the ALJ "lack[ed] jurisdiction to decide claims and issues beyond the IDEA[.]"  (*Id*. at 3.)

Following the ALJ's grant of the District's motion to dismiss the initial complaint, Plaintiffs filed an amended complaint in the administrative proceeding.  (*Id*.)  The District sought again to dismiss the amended due process complaint.  (*Id*.)

On July 30, 2019, the ALJ dismissed the amended due process complaint without prejudice.  In relevant part, the ALJ noted that a due process hearing was unnecessary because A.K.B.'s parents did not seek a remedy under IDEA.  (*Id*. at 4-5) (concluding further that "there is nothing to be gained at this time by having a hearing[.]"))  Indeed, by arguing that Plaintiffs' requested relief was unavailable under IDEA, the District itself urged this outcome:

---

[5]     Nonetheless, throughout the administrative proceeding, it appears the parties did not seek to resolve the dispute through an administrative resolution session or alternative dispute resolution, and the parties proceeded in an adversarial posture.  (Medeiros Decl., Ex. 4.)

> "[T]he [] District argues that the Parents' Complaint is not, and never has been, an IDEA matter. The [] District emphasizes that the Parents brought their Amended Complaint only to exhaust their IDEA remedies before proceeding to other litigation. The School District points out that the Parents continue to demand monetary relief, although they have been told that such relief is not available to them under the IDEA."

(*Id*. at 2.)

The ALJ agreed that the scope of the administrative proceeding precluded consideration of issues relating to, among others, compensatory damages. (*Id*. at 4) (finding that scope of due process proceeding precludes consideration of issues relating to both compensatory damages and medical causation, "which are beyond the reach of the IDEA and its remedies."). The ALJ ultimately dismissed the complaint without prejudice because the ALJ held that A.K.B.'s parents were "free to bring the [IDEA] claim again, should they wish to seek a remedy that might include compensatory education and related services relating to a period of time before April 16, 2019." (*Id*. at 5.) A.K.B.'s parents could "also seek services from the School District in the future, based on [A.K.B.'s] condition following the April 16, 2019 asthma exacerbation." (*Id*. at 5.) The ALJ acknowledged, however, that A.K.B. remains in a persistent vegetative state.

### B.       This Action and Defendants' Motion to Dismiss

The Complaint asserts four causes of action against both Defendants, alleging violations of the ADA, Rehab Act, MHRA, and Minnesota common law for medical malpractice. (Compl. ¶¶ 32-73 (Counts I-IV).) Plaintiffs seek to recover compensatory damages for Defendants' alleged failure to (i) implement a reasonable accommodation plan prior to April 16, 2019, and (ii) accommodate A.K.B.'s disability. However, based on the

parties' briefing and the November 25, 2019 oral argument, it appears that Plaintiffs are now only pursuing the federal claims under the ADA and Rehab Act against the District, not Ms. Murphy individually or in her official capacity.

Defendants now move to dismiss Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(1), arguing that the Court lacks subject matter jurisdiction, and under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs' Complaint fails to state a claim upon which relief can be granted. In support of Defendants' motion, Defendants filed an affidavit attaching as exhibits (1) A.K.B.'s asthma control plan; (2) the pulmonologist's "Updated Asthma Control Plan" referenced in the Complaint; (3) A.K.B.'s health office records; and (4) the ALJ's order dismissing Plaintiffs' amended due process complaint. [Doc. Nos. 13-14.]

## III. DISCUSSION

### A. Dismissal under Rule 12(b)(1)

#### 1. Standard of Review

When deciding a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) on the pleadings, a court must accept the claimant's factual allegations as true and view them in the light most favorable to the non-movant. *Great Rivers Habitat Alliance v. FEMA,* 615 F.3d 985, 988 (8th Cir.2010). The party invoking federal jurisdiction bears the burden of establishing jurisdiction exists. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). The court must ensure it has subject matter jurisdiction before proceeding. *Ark. Blue Cross & Blue Shield v. Little Rock Cardiology Clinic, P.A.,* 551 F.3d 812, 816 (8th Cir. 2009).

While generally, matters outside the pleadings are to be ignored, the Court has "authority to consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1)" without converting the motion into one for summary judgment. *Harris v. P.A.M. Transport, Inc.*, 339 F.3d 635, 637 n. 4 (8th Cir. 2003) (citing *Osborn v. United States,* 918 F.2d 724, 728 n. 4 (8th Cir.1990) (further citation omitted)). Here, the exhibits to an affidavit submitted include an order entered in the underlying administrative proceeding in this case.  (*See* Medeiros Decl., Ex. 4.)  Accordingly, the Court will consider this order in determining whether Plaintiffs exhausted any available administrative remedies.

### 2.    Summary of Arguments

The District asserts that the Court lacks subject matter jurisdiction over A.K.B.'s claims because A.K.B. failed to exhaust her administrative remedies before filing her Complaint.  (Defs.' Mem. [Doc. No. 11] at 6.)  The District bases its jurisdictional argument on the exhaustion of remedies requirement of the Individuals with Disabilities Education Act ("IDEA").  (*Id.*)  While an IDEA claim is not explicitly plead, the District argues that A.K.B. is nevertheless required to "exhaust the procedures" through the IDEA's administrative process because the "gravamen of [A.K.B.'s] Complaint" concerns the alleged denial of a free, appropriate public education ("FAPE").  (Defs.' Mem. at 8.)  The District moreover relies on the administrative proceeding as "strong further evidence that this matter falls within the IDEA," and further asserts the "dismissal of the administrative proceeding without administrative findings and a decision o[n] the merits means that the IDEA procedures were not exhausted."  (Defs.' Mem. at 9-10) (citing *Albright v. Mountain*

*Home Sch. Dist.*, 926 F.3d 942, 952 (8th Cir. 2019).)

In response, Plaintiffs vehemently contest Defendants' characterization of the Complaint as seeking relief for a denial of FAPE. Plaintiffs argue their claims seek relief beyond the reach of the IDEA. (Pls.' Opp'n [Doc. No. 21] at 11-13.) Specifically, Plaintiffs argue that by seeking damages for "medical accommodations" the District had failed to provide for A.K.B.'s known disability—not "educational accommodations"— Plaintiffs need not invoke the IDEA's formal procedures. (*Id.*)

Alternatively, even if the IDEA is implicated, Plaintiffs counter that *Albright* is distinguishable because the administrative proceeding there was resolved by a settlement. (Pls.' Opp'n at 10.) Unlike *Albright*, the ALJ here "considered the opposing arguments of the parties concerning [the District's] motion to dismiss, reviewed all of the facts relevant to any potential violations of the IDEA, and dismissed the IDEA claim[.]" (*Id.*) Additionally, Plaintiffs argue that further administrative steps here would be futile. (Pls.' Opp'n at 13-14.)

### 3. Analysis

Title II of the ADA and Section 504 of the Rehabilitation Act do not mandate the exhaustion of any administrative remedies.[6] *A.P. ex rel. Peterson v. Anoka–Hennepin Indep. Sch. Dist. No. 11,* 538 F. Supp. 2d 1125, 1152 (D. Minn. 2008). The parties do not dispute, however, that the IDEA's exhaustion requirement can be implicated when claims

---

[6] The same is true for MHRA claims. *I.E.C. v. Minneapolis Public Schs., Special Sch. Dist. No. 1,* 34 F. Supp. 3d 1006, 1016 (D. Minn. 2014). However, Defendants do not argue that the IDEA's exhaustion requirement applies to this claim. (*See* Defs.' Mem. at 7; Defs.' Reply at 10.)

brought under the ADA and the Rehabilitation Act are "related" to claims under the IDEA.

*Peterson,* 538 F. Supp. 2d at 1152; (Defs.' Mem. at 7; Pls.' Opp'n at 11) (citing *Fry v. Napoleon Community Schools*, 137 S. Ct. 743, 754 (2017)).  Such claims are "related" when the relief sought under the ADA and Section 504 of the Rehabilitation Act "is also available under" the IDEA.  *E.D. ex rel Dougherty v. Palmyra R-I Sch. Dist.,* 911 F.3d 938, 941 (8th Cir. 2019).  This is recognized, as the Eighth Circuit explained, by the IDEA statute itself:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, [or Section 504] of the Rehabilitation Act of 1973…except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the [IDEA's administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA].

*Id*. at 940 (citing 20 U.S.C. § 1415(*l*).)  Accordingly, Section 1415(*l*)'s plain language dictates that if A.K.B.'s parents seek relief "also available under" the IDEA, Plaintiffs must exhaust IDEA's administrative procedures and remedies.

> a.    **No Exhaustion of IDEA's Administrative Procedures and Remedies is Required Because the Relief Sought by Plaintiffs is Unavailable under the IDEA**

Plaintiffs argue that the relief sought here is unavailable under the IDEA.  (Pls. Opp'n at 11-13.)  Plaintiffs only seek monetary relief, which the District conceded at the administrative level "is not available [] under the IDEA."  (Medeiros Decl., Ex. 4 at 2.)  It is also undisputed that A.K.B. remains in a "persistent vegetative state and is presently unavailable to receive any form of education."  (*Id*. at 3.)  Thus, as even the District

vigorously argued before the ALJ, "there is no remedy the Administrative Law Judge could award under the IDEA that would benefit A.K.B." (*Id.* at 3.)

In support of their Rule 12(b)(1) argument, Defendants now rely on *Smith v. Rockwood R-VI Sch. Dist.*, 895 F.3d 566 (8th Cir. 2018) to assert that Plaintiffs were still required to exhaust their IDEA remedies regardless of the relief sought. (Defs.' Reply [Doc. No. 23] at 12.) Although the *Smith* court held that the "particular type of relief sought" does not change the "general rule of the IDEA's exhaustion requirement" when plaintiffs brought claims for money damages, the due process complaint filed there in the administrative proceeding specifically alleged "the denial of public education." *Id.* at 569.

The record here, on the other hand, reflects that Defendants argued to the contrary at the administrative level, and correctly asserted that Plaintiffs' claims are unrelated to the IDEA. (Medeiros Decl., Ex. 4 at 2) (citing District's position that A.K.B.'s complaint "is not, and never has been an IDEA matter").) Because of the present condition of A.K.B., moreover, which is not in dispute, the Court finds that there are no available remedies under the IDEA that would benefit her as she is unable to receive any form of education. Accordingly, the Court concludes the relief sought here is unavailable under the IDEA.

IDEA exhaustion, as the Supreme Court made clear in *Fry*, "hinges on whether a lawsuit seeks relief for a denial of a free appropriate public education." *Fry*, 137 S. Ct. at 754. If it does, then exhaustion must occur first. If, however, the lawsuit seeks relief "for simple discrimination," only tangentially related to education because the discriminatory acts just happened to take place in a school, then exhaustion is unnecessary. *Id.* at 754-56.

As Plaintiffs persuasively note, an example in *Fry* illustrates the type of situation

presented here. If, for example, a wheelchair-bound student sues a school district for discrimination under Title II because the building lacks access ramps, the Supreme Court concluded the school district is only the "location" of the discrimination alleged. *Id.* at 756. That suit does not concern the denial of a FAPE. Likewise, here, the Court finds that Plaintiffs have plausibly alleged that the District is only the "location" of the discrimination alleged by Plaintiffs. *Id.* And like the wheelchair-bound student's discrimination claim, A.K.B.'s medical care was not part of her educational curriculum at school, even though both situations necessarily involve "educational consequences." *Id.*

Ultimately, "a pair of hypothetical questions" is critical to determining whether the "gravamen" of the complaint is "the denial of a free appropriate public education[:]"

> First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance? ... [W]hen the answer [to both questions] is no, then the complaint probably does concern a [free appropriate public education], even if it does not explicitly say so . . . .

*Id.* at 754, 756; *see also Nelson v. Charles City Cmty. Sch. Dist.*, 900 F.3d 587, 592 (8th Cir. 2018) (stating that these hypothetical questions are fact-intensive and should not be "approach[ed] . . . at a high[ ] level of generality.").

In viewing the record in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have plausibly alleged that the answer to both questions is "yes." First, the Court finds that Plaintiffs could have brought essentially the same Complaint if the alleged conduct occurred at another public facility such as, for example, an after-school care

program, a summer camp, or other governmental unit. (*See* Pls.' Opp'n at 12.) Second, the Court finds that other individuals, like the District's adult employees, could have pressed essentially the same grievance against the District. (*Id*.) Thus, the "gravamen" of Plaintiffs' Complaint is not the denial of a FAPE.[7] Accordingly, the Court finds that Plaintiffs need not exhaust IDEA's administrative procedures and remedies.

### b. Even if Plaintiffs Were Required to Exhaust IDEA's Administrative Procedures and Remedies, They Have Adequately Done So Here

Alternatively, even if Plaintiffs needed to exhaust IDEA's administrative procedures and remedies, Plaintiffs argue they have adequately done so here. (Pls.' Opp'n at 9-10.) The Court agrees. As explained above, Plaintiffs' amended due process complaint was dismissed at the administrative level. While Defendants rely on *Albright* to suggest that a "pre-decision settlement [] fails to satisfy the IDEA's requirements," the Court finds this holding inapplicable here. *See Albright*, 926 F.3d at 952.

Unlike *Albright*, A.K.B.'s parents did not mediate an IDEA settlement to evade IDEA's procedural requirements. *Id*. The record reflects that the ALJ considered the opposing arguments of the parties concerning the District's motion to dismiss, reviewed all facts relevant to any potential violations of the IDEA, and dismissed the IDEA claim. (Medeiros Decl., Ex. 4.) In fact, the ALJ's decision was partly based on the District's urging that a hearing was unnecessary because there was "no effective relief the

---

[7] Moreover, contrary to Defendants' assertions, (Defs.' Mem. at 9), the Court finds that Plaintiffs' pursuit of an administrative hearing prior to the filing of the Complaint does not suggest that Plaintiffs' claims are IDEA claims. Both parties agreed, at the administrative level, that Plaintiffs were not seeking a remedy under the IDEA.

Administrative Law Judge can order in an IDEA due process hearing."[8]  (*Id.* at 3.)  The Court therefore finds that Plaintiffs adequately exhausted their administrative procedures and remedies.

### c.        The Futility of Any Administrative Procedures and Remedies

Moreover, even if additional administrative steps were required here, Plaintiffs further contend that the exhaustion requirement is excused on grounds of futility.  (Pls.' Opp'n at 12-13.)  Defendants, on the other hand, argue that the administrative agency should further develop the record for judicial review "and apply its expertise to [] Plaintiffs' claims to the extent those claims relate to issues within the purview of the IDEA[.]"  (Defs.' Reply at 12-13.)  The Court again agrees with Plaintiffs.

The parties do not dispute that courts recognize futility as an exception to the exhaustion requirement.  (Defs.' Reply at 12-13; Pls.' Opp'n at 12-13.)  Indeed, courts in other circuits appear to have recognized similar scenarios where the exhaustion

---

[8]        Defendants further rely on two cases allegedly supporting the broad proposition that "a claim dismissed without prejudice fails to exhaust IDEA procedures."  (Defs.' Reply at 11-12.)  The Court is unpersuaded that these decisions dictate a different result.  In *A.C. ex rel. M.C. v. Indep. Sch. Dist. No*. 152, No. 06-cv-30099, 2006 WL 3227768, at *2 (D. Minn. Nov. 7, 2006), the parties appear to have discussed resolving the dispute during the administrative hearing.  The ALJ there further concluded that it lacked subject matter jurisdiction only because the student was "no longer enrolled in the District."  *Id*.  Here, the record reflects that the parties were adversarial at all times.  The ALJ also concluded that A.K.B.'s parents did not seek relief under IDEA, and a hearing would be unnecessary because of A.K.B.'s present condition.
        And in *Parrish v. Bentonville Sch. Dist*., No. 15-cv-5083, 2015 WL 9275739, at *2 (W.D. Ark. Dec. 21, 2015), the court there did not dismiss the claims under the ADA and Rehab Act, but only dismissed the IDEA claims because such claims were "dismissed without prejudice at the administrative level."  *Id*. at *3 (holding that plaintiffs "sufficiently stated a claim under Section 504 [of the Rehab Act] and under the ADA.").

requirement may be excused for futility. *See*, *e.g.*, *Taylor v. Altoona Area Sch. Dist*., 737 F. Supp. 2d. 474, 482 (W.D. Pa. 2010) (where parents of a deceased child sought relief for a school board's failure to provide IDEA services while the child was still alive); *Lester H. by Octavia P. v. Gilhool,* 916 F.2d 865, 870 (3d Cir. 1990) (where relief of compensatory education was unobtainable through the administrative process).

Defendants articulate no reasonable basis for why such an exception should not apply here. It is undisputed that A.K.B. remains in a permanent vegetative state, and Plaintiffs cannot obtain their desired relief through the administrative process. The Court recognizes the general principle that Defendants espouse: the IDEA includes elaborate procedures for redressing harm and Congress' intent for such a remedial scheme "was to allow educational experts the opportunity to address complaints first." *Taylor*, 737 F. Supp. 2d at 482 (finding that the IDEA "does not envision courts as the factfinders in the first instance.") (quotation omitted). But because A.K.B. remains in a persistent vegetative state, the Court would not be usurping from the District any opportunity to address A.K.B.'s educational needs by excusing exhaustion in this case. Plaintiffs are therefore excused from the exhaustion requirement, assuming an IDEA claim is even implicated, on grounds of futility.

Accordingly, the Court has subject matter jurisdiction over Plaintiffs' claims under the ADA and Rehab Act.

**B.** **Dismissal under Rule 12(b)(6)**

Defendants also move to dismiss all Counts in the Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (*See* Defs.' Mem. at 10-20.) When evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court assumes the facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). In doing so, however, the Court need not defer to legal conclusions or "formulaic recitation[s] of the elements of a cause of action." *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), and consequently permit a claim to advance into discovery, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Neubauer v. FedEx Corp.*, 849 F.3d 400, 404 (8th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). While the plausibility standard is "not akin to a probability requirement," it necessarily requires a complaint to present "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

When considering a motion to dismiss under Rule 12(b)(6), "the court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). Courts may, however, "consider the pleadings themselves,

materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (citation omitted) (internal quotation marks omitted). Here, certain exhibits to an affidavit submitted, which include A.K.B.'s asthma control plan, the "Updated Asthma Plan," and A.K.B.'s health office records, are referenced in the Complaint, and are embraced by the pleadings. (*See* Medeiros Decl., Exs. 1-3.) Accordingly, the Court will consider these documents in determining whether Plaintiffs state a claim upon which relief can be granted.

### 1. Counts I-III – Claims under the ADA, Rehab Act, and MHRA (District)

The Court considers Plaintiffs' claims against the District under the ADA, Rehab Act, and MHRA[9] together. The parties agree that the ADA and Rehab Act are similar in substance and "cases interpreting either are applicable and interchangeable" for analytical purposes. (Defs.' Mem. at 10) (citing *Bahl v. Cnty of Ramsey*, 695 F.3d 778, 783 (8th Cir. 2012) (internal citation omitted)); (*see also* Pls.' Opp'n at 14-17.) Claims under the ADA and MHRA are also construed similarly. (*Id*; *see also* Pls.' Opp'n at 19.)

Plaintiffs contend that the District violated the ADA, Rehab Act, and MHRA when it failed to implement an accommodation plan and reasonably accommodate A.K.B.'s disability. The ADA, Rehab Act, and MHRA prohibit a public entity from denying its services to a qualified individual with a disability by reason of that disability. To state a claim, Plaintiffs must demonstrate (1) that A.K.B. is a qualified individual with a disability, (2) that the District is a "public entity" (for ADA purposes) or receives federal funding (for

---

[9] Plaintiffs' MHRA claim against Ms. Murphy is discussed below.

Rehab Act purposes), (3) that A.K.B. was denied the benefit of a service provided by the District, and (4) that the denial was because of her disability.

For purposes of this motion, the parties agree that A.K.B. is a qualified individual with a disability, that the District is a public entity (for purposes of the ADA) and receives federal funding (for purposes of the Rehab Act). The parties disagree, however, about whether the Complaint sufficiently alleges the requisite actions by District officials and its employees to hold the entity liable under the ADA, Rehab Act, or MHRA. The Court addresses this issue below.

### a. Deliberate Indifference

The parties appear to agree that compensatory damages are generally available under the ADA and § 504 of the Rehab Act on a showing of deliberate indifference by the District. (Defs.' Mem. at 11-12; Pls.' Opp'n at 19); *see also Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011). Both parties rely on *Peterson* in describing the standard to establish "deliberate indifference" on the part of the defendant. *Peterson*, 538 F. Supp. at 1147 (citing *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382 (1997)). A defendant is deliberately indifferent if he acts with "conscious disregard" for a plaintiffs' rights. *Id*. Such conscious disregard exists only if either: (1) the defendant actually knows that its actions will violate plaintiffs' rights; or (2) such a violation is the "plainly obvious consequence" of the defendant's actions. *Id*. (citation omitted).

Plaintiffs argue that there are two ways they can recover from the District. First, Plaintiffs argue the District can be held vicariously liable under the ADA or Rehab Act for acts taken by Ms. Murphy or other District employees within the scope of their

employment. (Pls.' Opp'n at 14-17.) Thus, to hold the District liable, Plaintiffs argue they need only to allege that Ms. Murphy (or any other District employee) was deliberately indifferent, because there is no dispute, thus far, that Ms. Murphy was acting within the scope of her employment.

Second, Plaintiffs argue that, even if the District cannot be held vicariously liable under the ADA or Rehab Act, the District can be held directly liable for its own deliberate indifference because the Complaint sets forth sufficient factual allegations for the reasonable expectation that discovery will reveal employees who had authority to address the alleged discrimination and to institute corrective measures, but exhibited deliberate indifference. (Pls.' Opp'n at 22-24.)

### *(i)* *Vicarious Liability*

Neither the Supreme Court nor the Eighth Circuit has directly addressed the question of whether a public entity can be held vicariously liable under Title II of the ADA or § 504 of the Rehab Act for the deliberately indifferent conduct of its employees. *See City & County of San Francisco, California v. Sheehan*, 135 S. Ct. 1765, 1773-74 (2015) (expressly declining to decide whether public entities can be "vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees.") Nonetheless, every circuit court considering the issue of vicarious liability under these statutes has held that a public entity can be held vicariously liable. *See Delano-Pyle v. Victoria Cty., Tex*, 302 F.3d 567, 574-75 (5th Cir. 2002); *Duvall v. Cty. Of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001); *Rosen v. Montgomery Cty., Md*., 121 F.3d 154, 156 n.2 and 157 n.3 (4th Cir. 1997); *Bonner v. Lewis*, 857 F.2d 559, 566-67 (9th Cir. 1988).

In *Bonner*, for instance, the Ninth Circuit concluded that public entities can be vicariously liable under § 504 of the Rehab Act for three convincing reasons. First, the court noted that the regulatory scheme which implements § 504 of the Rehab Act relies heavily on the idea of vicarious liability. *Bonner*, 857 F.2d at 566 (citing *Patton v. Dumpson,* 498 F. Supp. 933, 942 (S.D.N.Y. 1980)). For example, if a program is in noncompliance with § 504, then the recipient of the federal aid (*i.e.* the District) is directed to remedy the situation, not the employee who perpetrated the violation. 28 C.F.R. § 42.504; *see Patton,* 498 F. Supp. at 942. Further, the ultimate sanction for non-compliance, the elimination of federal funding, is also aimed at the recipient and not the employee. 28 C.F.R. § 42.530; 28 C.F.R. § 42.108; *see Patton,* 498 F. Supp. at 942. Likewise, while not addressed by *Bonner*, the Court notes that Title II of the ADA expressly incorporates "[t]he remedies, procedures, and rights set forth in [the Rehab Act]." 42 U.S.C § 12133. Indeed, the "nondiscrimination policy in [§ 504 of the Rehab Act]" is extended by virtue of Title II of the ADA "to cover all State and local governmental entities." *See* H.R.Rep. No. 101-116, at 44 (1989). But still, as the parties agree, Title II of the ADA does not impose liabilities against individuals. Thus, the remedial schemes of both statutes turn heavily on vicarious liability.

Second, the *Bonner* court noted that "the general rule regarding actions under civil rights statutes is that *respondeat superior* applies." *Bonner*, 857 F.2d at 566-567 (internal citation omitted.) The *Bonner* court moreover cited specific examples in which the doctrine had been applied to private actions under Title VIII of the Fair Housing Act of 1968, 42 U.S.C. § 3612, Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–5,

and 42 U.S.C. § 1981. *Id.* (citing *Patton,* 498 F. Supp. at 942–43).

Third, the *Bonner* court noted that the policy behind the Rehab Act (and by extension Title II of the ADA) supports vicarious liability:

> The application of *respondeat superior* to § 504 suits would be entirely consistent with the policy of that statute, which is to eliminate discrimination against the [disabled]. The justification for imposing vicarious liability on employers for the acts of employees is well-known. It creates an incentive for the employer to exercise special care in the selection, instruction and supervision of his employees, thereby reducing the risks of accidents ... In the absence of a Congressional directive to the contrary, this court can assume only that Congress intended the judiciary to use every available tool to eliminate discrimination against the [disabled] in federally funded programs....

*Id.* at 566-567. (internal quotation omitted.)

Although *Bonner* only analyzed the Rehab Act, the Eighth Circuit explicitly acknowledged, as explained above, that "cases interpreting either" the Rehab Act or Title II of the ADA are "applicable and interchangeable for analytical purposes." *Bahl*, 695 F.3d at 783 (citations omitted). The Court therefore finds *Bonner* persuasive and concludes that the District, as a public entity, can be held vicariously liable for its employees under Title II of the ADA and the Rehab Act.

The Court further finds the remaining circuit decisions above persuasive, and respectfully disagrees with a court in this District that held these holdings inapposite. *Hooper v. City of St. Paul*, No. 17-cv-3442, 2019 WL 4015443, at *10-11 (D. Minn. Aug. 26, 2019). In *Hooper*, the court disagreed with these circuit decisions for two reasons. First, the *Hooper* court asserted the texts of the ADA and Rehab Act statutes suggest that

"Congress did not open the door to vicarious liability." *Id*. at *9. Second, the *Hooper* court reasoned that a "materially identical statute—Title IX of the Education Amendments of 1972—does not establish vicarious liability." *Id*. While both lines of reasoning in *Hooper* are addressed further below, the Court agrees with the weight of authority in other circuits supporting vicarious liability under both statutes.

The *Hooper* court first contends that these other circuit decisions, in affirming vicarious liability under Title II, focused on the employment provisions of the ADA (Title I) —not the public entity provisions (Title II). *Id*. at *9-11. The *Hooper* court therefore concludes that these cases "rest on a shaky foundation" because they "do not acknowledge the critical difference between the texts of Title I and Title II." *Id*. at *11. That is, Title I specifically prohibits an "employer" from discriminating against a qualified individual with a disability in regard to hiring, firing, or promotions or any other term, condition, or privilege of employment. 42 U.S.C. § 12112(a). Under Title I, "employer" is defined as "a person engaged in an industry affecting commerce who has 15 or more employees . . . *and any agent* of such person . . . ." 42 U.S.C. § 12111(5)(A) (emphasis added).

By contrast, Title II of the ADA prohibits public entities from denying a qualified individual with a disability the benefit of any service, program, or activity that the entity provides. 42 U.S.C. § 12132. A "public entity" is defined, in relevant part to include "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)-(B). As the *Hooper* court points out, Title II defines "public entity" as not specifically including

"any agent" of the public entity, even though Title I of the ADA defines "employer" to include "any agent" of the employer. *Hooper*, 2019 WL 4015443, at \*10. Because of this difference in text, the *Hooper* court held that Congress made a "deliberate decision" that public entities should not be held "vicariously liable under Title II (or the [Rehab Act]) for the acts of their employees." *Id*. at \*11.

The *Hooper* court acknowledges, however, that the ADA defines "public entity" to include an "instrumentality of a State or States or local government." *Hooper*, 2019 WL 4015443, at \*10 n. 14. The ADA does not define what the term "instrumentality" refers to in this context. When a term is undefined, courts normally give it its ordinary meaning. *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167, 175, 129 S. Ct. 2343, 2350 (2009) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" (internal quotation marks omitted)). Plaintiffs rely on the definition of "instrumentality" set forth in Black's Law Dictionary, which includes "a means or agency through which a function of another entity is accomplished." (Pls.' Opp'n at 15) (citing *Black's Law Dictionary* (11th ed. 2019)).[10] Based on the plain meaning, the use of the term "instrumentality" in the ADA does not clearly exclude individual agents or employees of a public entity.

The *Hooper* court sweeps aside this definition and contends that "instrumentality"

---

[10] Even if the Court were to construe the term as of the time the statute was passed, *see*, *e.g.*, *United States v. Santos*, 553 U.S. 507, 512 (2008), the definition of "instrumentality" in effect in 1990 similarly includes "something by which an end is achieved" or "a means, medium, agency." *Black's Law Dictionary* (6th ed. 1990)).

refs to "a smaller unit of, or another entity working on behalf of, a state or local government, and not every person employed by a state or local government." *Hooper*, 2019 WL 4015443 at *10 n. 14. This distinction is nowhere to be found in the statute or legislative history. Nonetheless, the *Hooper* court suggests that the term "instrumentality" excludes such employees by looking at its surrounding statutory friends, "department," "agency," and "special purpose district." *Id.* (citation omitted). But bestowing this definition of "instrumentality," as proposed by *Hooper*, appears to render the preceding terms of "agency" and "department" mere surplusage: both are entities that can be described as smaller subdivisions, units, or organs of a government that carry out functions of the government. *See, e.g.*, *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 513 (1981) (It is a "well-settled rule that all parts of a statute, if possible, are to be given effect.") The Court finds that the term "instrumentality" should not be construed in a manner that would swallow these other terms. *See Corley v. United States*, 129 S. Ct. 1558, 1560 (2009).

Moreover, the *Hooper* court's interpretation of the term "instrumentality" appears difficult to reconcile with the Supreme Court's reasoning in *Schindler Elevator Corp.,* 131 S. Ct. 1885 (2011). *Hooper*, 2019 WL 4015443 at *10 n. 14. There, the lower court had concluded that the term "reports" in a *qui tam* statute should be given a narrow meaning since it fell among terms such as "hearing, audit, or investigation" and "civil, criminal [and] administrative hearing" in defining the public source exclusion for *qui tam* claims. *Id.* The Supreme Court rejected that view because it did not take into account the entire statute, including Congress' intent for broad exclusions. *Id.* at 7. Here, the *Hooper* court's construction of "instrumentality" as constrained by the characteristics of the surrounding

terms "agency" and "department" would work a similarly impermissible narrowing of a statute intended broadly to eliminate discrimination against the disabled.

And, since context here gives meaning, the legislative history of the ADA gives the Court guidance on how generally to construe the scope of Title II of the ADA. The House Judiciary Committee Report indicates that Title II of the ADA should be "read to incorporate provisions of titles I and III which are not inconsistent with the regulations implementing [§ 504 of the Rehab Act]… [and] *nothing in the other titles* should be construed to lessen the standards in the Rehabilitation Act regulations which are incorporated by reference in [Title II]." *See* H.R.Rep. No. 485, Pt. 3, at 51 (1990) (emphasis added). Likewise, statutory provisions of the ADA waiving state immunity treat public and private entities the same, and provide that remedies are available "to the same extent as such remedies are available for such a violation in an action against any *public or private entity* other than a State." 42 U.S.C. § 12202 (emphasis added); *see also* 42 U.S.C. § 2000d-7. Accordingly, the Court finds that any difference in text between titles I and II should not be read to limit or narrow Title II of the ADA. The Court generally finds no evidence of an intent by Congress to restrict public entities from vicarious liability for its agents or employees.

The Court also is bound to analyze claims under the MHRA in the same manner as claims under the ADA. (Defs.' Mem. at 19) (citing *Bahl*, 695 F.3d at 783). Despite the Eighth Circuit's guidance, the *Hooper* court articulates no basis for the availability of vicarious liability under the statutory text of the MHRA, *albeit* turning on the issue of official immunity, but unavailability under Title II of the ADA. *Hooper*, 2019 WL

4015443, at *19-21.[11]

The *Hooper* court next contends that *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), a case decided under Title IX of the Education Amendments of 1972, "control[s] the question of whether a public entity can be held vicariously liable under Title II or the [Rehab Act]." *Hooper*, 2019 WL 4015443 at *14. In *Gebser*, the Supreme Court held that a school district is not liable for damages for the conduct of its teachers under a theory of *respondeat superior* alone. *Gebser,* 524 U.S. at 285-286.

The Supreme Court made clear, however, that *Gebser* is not dispositive on the issue of vicarious liability here. *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1773–74 (2015) (finding that the court "never decided" whether an entity can be held vicariously liable for money damages for the purposeful or deliberate conduct of its employees). Nonetheless, the *Hooper* court finds *Gebser* controlling because Title IX was modeled after Title VI of the Civil Rights Act of 1964, and the remedial reach of the Rehab Act and the ADA is defined, directly or indirectly, by reference to Title VI.[12] Accordingly, given the close connection between Title IX and Title VI, the *Hooper* court determined that it is "not persuaded" by other circuit court decisions finding vicarious liability under the ADA and Rehab Act. *Hooper*, 2019 WL 4015443 at *14.

---

[11] Although *Hooper* addressed the issue of vicarious liability for alleged MHRA violations as co-extensive with official immunity, Defendants have not raised this issue here. *See Hooper*, 2019 WL 4015443, at *19-21.

[12] Title II of the ADA incorporates "[t]he remedies, procedures, and rights set forth in [the Rehab Act]." 42 U.S.C. § 12133. In turn, the Rehab Act incorporates "[t]he remedies, procedures, and rights set forth in [Title VI] of the Civil Rights Act of 1964." 29 U.S.C. § 794a(a)(1). Thus, both the ADA and Rehab Act effectively incorporate the remedies of Title VI.

The Court finds this reasoning to conflict with the Eighth Circuit's ruling in *Miener v. Missouri*, 673 F.2d 969 (8th Cir. 1982), which is cited by the House Judiciary Committee Report as an example of the "panoply of remedies" available under Title II of the ADA. H.R.Rep. No. 485, Pt. 3, at 52 n. 62, *reprinted in* 1990 U.S.C.C.A.N. at 475 n. 62. There the Eighth Circuit did not interpret both Title VI and Title IX consistently, and did not rely on Title IX when applying the Rehab Act. *Miener*, 673 F.2d at 978 n. 9. *Miener* held that an implied private right of action for damages was available under § 504 of the Rehab Act where a Special School District, its Board of Education, and its officials were sued in their official capacities. *Id.* at 983. No such damages were available under Title IX, even though the Eighth Circuit acknowledged that Title IX was a "sister" statute to Title VI and "adopted the same procedures" to enforce the statute and corresponding regulations. *Id.* at 978 n. 9. Accordingly, the Court finds that the Eighth Circuit's ruling in *Miener*—cited approvingly in the legislative history of the ADA—supports the holdings of other circuit courts that vicarious liability exists under the ADA and Rehab Act without deferring to Title IX. *See, e.g.*, *Delano-Pyle*, 302 F.3d at 574-75; *Duvall*, 260 F.3d at 1141; *Rosen*, 121 F.3d at 156 n.2 and 157 n.3; *Bonner*, 857 F.2d at 566-67.

### *(ii)        Direct Liability*

In any event, the Court need not resolve the question left unanswered by the Supreme Court in *Sheehan* for purposes of ruling on Defendants' motion to dismiss. Even assuming the ruling in *Gebser* applied here, *Gebser* noted that a school district may be held directly liable with evidence of its actual notice and deliberate indifference. *Gebser,* 524 U.S. at 292-293. Thus, even under the *Gebser* court's actual notice and authority standard,

the Complaint sets forth sufficient facts to allow Plaintiffs' damages claim to proceed to discovery. *Id.*; *cf. Reed v. Vill. of Shorewood*, 704 F.2d 943, 953 (7th Cir. 1983), *abrogated on other grounds by Brunson v. Murray*, 843 F.3d 698 (7th Cir. 2016) ("At some level of authority, there must be an official whose acts reflect governmental policy, for the government necessarily acts through its agents.") Here, Plaintiffs allege the District had knowledge requesting mandatory and reasonable accommodations for A.K.B.'s disability. (Compl. ¶ 18.) Plaintiffs point to, at minimum, a pulmonologist's note about A.K.B.'s requested accommodation for her asthma that the District had in its possession at least as of April 16, 2019. (*Id.*; *see also* Medeiros Decl., Ex. 2.) Yet, despite this knowledge, the District failed to implement such accommodations. (*Id.*) Construed in favor of Plaintiffs, the Complaint sets forth sufficient factual matter "to raise a reasonable expectation that discovery will reveal evidence" to support liability for the wrongdoing alleged. *Twombly*, 550 U.S. at 556.

### b.       Bad Faith or Gross Misjudgment

Alternatively, while the District concedes that compensatory damages are generally available under the ADA and Rehab Act on a showing of "deliberate indifference" by the District, (Defs.' Mem. at 11-12), the District further argues that Plaintiffs are not entitled to damages here because they do not allege that any school officials' conduct rose to the level of "bad faith or gross misjudgment." (Defs.' Mem. at 15-16) (citing *I.Z.M. v. Rosemount-Apple Valley-Eagan Pub. Schs.*, 863 F.3d 966, 973 (8th Cir. 2017) (applying higher standard for claims challenging educational services provided to disabled children)).

The Court disagrees with Defendants. Even in *Peterson*, a case on which

Defendants rely, a court in this District rejected this standard for claims related "only tangentially to education." 538 F. Supp. 2d at 1146. In *Peterson*, the parents of a diabetic boy challenged a school district's failure to accommodate the child's diabetes. *Id*. Because the claim did not specifically request educational services, the *Peterson* court allowed compensatory damages under the ADA and Rehab Act on a showing of deliberate indifference. *Id*. at 1146-1147.

Here, the Court finds that the District fails to differentiate A.K.B.'s claims from the claims in *Peterson*. As explained above, Plaintiffs are not asking the District for specific educational services. Rather, as noted by Plaintiffs' counsel at oral argument, A.K.B.'s claims request a medical accommodation.[13] A.K.B.'s parents asked the District to accommodate A.K.B.'s asthma "so that [she] would be safe and healthy at school; this is more like asking [the] District [] to accommodate a wheelchair-bound student by installing

---

[13] In response, Defendants counter that Plaintiffs' ADA claim falls within the medical treatment exception to ADA liability. (Defs.' Reply at 2-5.)

Construing the Complaint in Plaintiffs' favor, the Court again disagrees with Defendants. The Court finds *Dinkins v. Corr. Med. Servs.,* 743 F.3d 633 (8th Cir. 2014) instructive. There, the Eighth Circuit affirmed the dismissal of certain claims an inmate brought against doctors based on medical treatment decisions, such as diagnosing and treating a medical condition. *Id*. at 634. But the inmate's allegation that he was denied physical therapy, when medically prescribed, supported a viable claim under the ADA and Rehab Act. Here, the Court finds that Defendants' alleged failure to follow medical instructions parallels the inmate's prescribed treatment for physical therapy in *Dinkins*. Defendants were neither alleged to be diagnosing A.K.B.'s conditions nor was Ms. Murphy allegedly treating A.K.B.'s asthma. As alleged in the Complaint, no respiratory tests were conducted on A.K.B. at all. (Compl. ¶ 19.) Accordingly, Defendants' alleged actions do not fall within the medical treatment decision exception under the ADA. *See Peterson*, 538 F. Supp. 2d at1149 (allowing claims under the ADA and Rehab Act based on blood-glucose monitoring and insulin-pump operation of diabetic student).

a ramp or widening doors than it is like asking for specific educational services." *Id.* at 1146-1147. No claims were brought by Plaintiffs under the IDEA, further supporting the conclusion that Plaintiffs' claims are only "tangentially related to education." *Id.* at 1146. Thus, the Court finds—consistent with other courts in this district—that allegations of deliberate indifference suffice to sustain ADA and Rehab Act damages claims.

### 2. Counts III-IV – Claims under MHRA (Ms. Murphy) and Medical Malpractice (Both Defendants)

The parties do not dispute that Plaintiffs' MHRA claim rises and falls with the ADA and Rehab Act claims. Because Plaintiffs voluntarily dismissed both federal claims against Ms. Murphy, however, the parties did not specifically address whether Ms. Murphy can be individually liable under the MHRA. The two cases upon which Defendants rely do not sufficiently support dismissing the MHRA claim against Ms. Murphy. (Defs.' Mem. at 17-18) (citing *Hough v. Shakopee Public Sch.*, 608 F. Supp. 2d 1087, 1117 (D. Minn. 2009) (finding no need to decide whether individuals can be sued for disability discrimination under the MHRA and dismissing the MHRA claim on other grounds); *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 801 (D. Minn. 2013) (finding no individual liability under MHRA in unfair employment context). Without adequate briefing on the issue, the Court does not address the merits of this issue. Accordingly, the Court denies Defendants' motion to dismiss the MHRA claim against Ms. Murphy.

As for Plaintiffs' medical malpractice claim against both Defendants, the Court exercises supplemental jurisdiction over this state-law claim because the Court has jurisdiction over this claim pursuant to 28 U.S.C. § 1367(a), which permits a district court

to exercise supplemental jurisdiction over claims that are part of the same case or controversy as the claims that fall within the court's original jurisdiction.

## IV.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim [Doc. No. 10] is **GRANTED in part and DENIED in part.**

Dated:    March 26, 2020                                    s/Susan Richard Nelson
                                                            SUSAN RICHARD NELSON
                                                            United States District Judge